UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| John P. Leon   JL4638<br>Scott M. Zauber SZ6086<br>William P. Rubley WR4169<br>Subranni Zauber LLC<br>750 Route 73 South – Suite 307B<br>Marlton, N.J 08053<br>(609) 347-7000; FAX (609) 345-4545<br>Attorneys for Debtors | |
| In Re:<br><br>RENAULT WINERY, INC.<br><br>                    Debtor | Case No.:  14-33075-ABA<br>Judge:  Andrew B. Altenburg, Jr.<br>Chapter 11 |
| In re :<br><br>RENAULT GOLF, LLC<br><br>                    Debtor | Case No.:  14-33079-ABA<br>Judge:  Andrew B. Altenburg, Jr.<br>Chapter 11 |
| In re:<br><br>TUSCANY HOUSE, LLC<br><br>                    Debtor | Case No.:  14-33084-ABA<br>Judge:  Andrew B. Altenburg, Jr.<br>Chapter 11 |
| In re:<br><br>RENAULT WINERY PROPERTIES, LLC<br><br>                    Debtor | Case No.:  14-33080-ABA<br>Judge:  Andrew B. Altenburg, Jr.<br>Chapter 11 |
| In re:<br><br>RENAULT REALTY CO., LLC<br><br>                    Debtor | Case No.:  14-33082-ABA<br>Judge:  Andrew B. Altenburg, Jr.<br>Chapter 11 |

**Declaration of Dennis Del Vecchio in Support of
<u>Debtors' Chapter 11 Petitions and First Day Motions</u>**

1

I, Dennis Del Vecchio, hereby certify as follows:

1.  I am the Chief Operating Officer of the Debtors, Renault Winery, LLC, Renault Golf, LLC, Tuscany House, LLC, Renault Winery Property, LLC and Renault Realty Co., LLC (collectively "Debtors"). I have held this position since February of 2014. I was also the Chief Operating Officer of the Debtors years ago before I left in 2008. In February, 2014 I was asked to return by the Debtors to assist them with restructuring their finances and operations and navigating them through their current financial situation. I have intimate knowledge of the facts contained in this certification and I make this certification based on personal knowledge and a review of the books and records of the Debtors.

A. FACTUAL BACKGROUND

2.  The Debtors consist of five separate companies, four (4) New Jersey limited liability companies, and one (1) New Jersey corporation that, cooperatively, run a winery, championship golf course, two (2) restaurants, a boutique hotel, and a banquet facility. The hotel is located in Egg Harbor City, N.J. and the other businesses are located on adjacent property in Galloway Township, N.J. The mailing address for all facilities is located at 72 North Bremen Avenue, in Egg Harbor City, New Jersey.

3.  By way of background, Renault Winery has served South Jersey as a winery and restaurant facility for the past 150 years. Joseph Milza and his wife, Geraldine, took over the operations of Renault Winery in 1974. Mr. Milza and his wife, along with their children and grandchildren,[1] continue to operate the winery and the related facilities. In 2001 Renault added a fifty (50) room boutique luxury hotel called Tuscany House, and two (2) restaurants named the Gourmet Room and Joseph's Restaurant. In 2004 the winery also added at 7200 yard

---

[1] A detailed breakdown of the various Debtors and the principals and members of each Debtor is more fully set forth in Section (F)(i)., *supra*.

2

championship golf course to its portfolio. All of the different facilities partner together to offer a unique and all inclusive vacation package that caters to both out-of-state patrons and local residents alike.

4. The facilities include the 7,200 yard champion golf course (which sits on 220 acres), 20 acres of vineyards and gardens, the Tuscany House, a banquet room and two (2) restaurants, surrounded by approximately 1,100 acres of undeveloped natural woodlands and pinelands.

5. The winery employs twenty (20) full time employees and fifty four (54) part time employees, while Tuscany House employs fifteen (15) full time and forty seven (47) part time employees, and Renault Golf employs seven (7) full time employees and thirty five (35) part time employees.

6. In the past three years, the Debtors have generated between $6,000,000 and $7,000,000 million in combined revenue, and the Debtors expect to generate between $7,000,000 and $8,000,000 in revenue in the next three years.

### B. THE OCEANFIRST BANK NOTES AND MORTGAGES

7. In July of 2009, the Debtors were looking to restructure and consolidate their existing debt. On December 1, 2009, Debtors entered into a Business Loan Agreement ("First Loan Agreement") with OceanFirst Bank ("OceanFirst"), whereby they borrowed from OceanFirst the original principal amount of Six Million Five Hundred Fifty Four Thousand Dollars ($6,554,000.00) (the "First Loan"). Together with the Business Loan Agreement, the Debtors also executed and delivered to OceanFirst a Promissory Note, a Mortgage, a Commercial Security Agreement, an Assignment of Leases and Rents (collectively the "Loan

Documents"), and various other loan documents. True copies of the Loan Documents are attached hereto as **Exhibit A**.

8. The real estate subject to the Bank's Mortgage is commonly known as 72 and 2101-2159 North Bremen Avenue, Egg Harbor City, Atlantic County, New Jersey. That real estate is more fully described in the Mortgage ("First Mortgage") attached hereto (see Exhibit A). Essentially, debtors Renault Realty Co., LLC, Renault Winery, Inc., and Renault Winery Properties, LLC pledged the winery, the hotel, and the golf course property as collateral for the First Loan. However the remaining, undeveloped property (approximately 1,100 acres) was not pledged to secure the First Loan.

9. The First Mortgage was duly recorded on January 5, 2010, in the Clerk's office of Atlantic County book 13095, CFN 2010000871. The First Mortgage was re-recorded to amend the legal description on April 8, 2010, in the Clerk's office of Atlantic County book 13131, CFN 2010021623.

10. Furthermore, as additional security for payment of the First Note, the Debtors provided to Ocean First a security interest, in among other things, all of the Debtors' right, title and interest to any and all of its business assets, accounts receivable, chattel paper, equipment, furniture, inventory, deposit accounts, general intangibles, after acquired property, and products and proceeds of same (the "Collateral"). To perfect its interests in the Collateral, OceanFirst filed Uniform Commercial Code Financing Statements with the State of New Jersey, Department of Treasury and in the Atlantic County Clerk's Office.

11. Finally, Joseph P. Milza, Sr. and Geraldine P. Milza, also executed and delivered to OceanFirst their personal guarantees in which they agreed to pay all sums owed by the

4

Borrower which may become outstanding on the First Note, or any further obligation owed by Borrower to OceanFirst.

12.	Thereafter, on or around May 26, 2010, Debtors executed and delivered toOcean First a Change in Terms Agreement (the "CIT"). Under the CIT the repayment of the FirstLoan was changed from a twenty year amortization schedule to a twenty five year amortization schedule. Pursuant to the terms of the CIT all terms, conditions and provisions of the First Loan Documents remained unchanged and were to remain in full force and effect, except as specifically modified therein

13.	Also on May 26, 2010, Debtors entered into a Business Loan Agreement ("Second Loan Agreement") with the Lender wherein it borrowed from OceanFirst the original principal amount of Two Hundred Thousand Dollars ($200,000.00) (the "Second Loan").

14.	In association with the Second Loan, Debtors executed and delivered to OceanFirst a promissory note in the sum of $200,000.00 (the "Second Note").

15.	To secure payment of the Second Note, Renault Winery Properties, LLC, Renault Winery, Inc. and Renault Realty, Co., LLC executed a Mortgage and Assignment of Leases and Rents on the Mortgaged Property (the "Second Mortgage") to OceanFirst on May 26, 2010. The Second Mortgage was duly recorded on June 1, 2010, in the Clerk's office of Atlantic County book 13151, CFN 2010032753.

16.	As additional security for payment of the Second Note, the Debtors provided to Ocean First a security interest, in among other things, all of the Debtor's right title and interest to any and all of its business assets, accounts receivable, chattel paper, equipment, furniture, inventory, deposit accounts, general intangibles, after acquired property, and products and proceeds of same Collateral. To perfect its interests in the Collateral, OceanFirst filed Uniform

Commercial Code Financing Statements with the State of New Jersey, Department of Treasury and the Atlantic County Clerk's Office. The Second Loan Agreement, Second Note, Second Mortgage, Guarantee, and UCC-1 s are referred to collectively as the "Second Loan Documents." The loans evidenced by the First Loan Documents and Second Loan Documents are collectively referred to as the "OceanFirst Loans."

### C.  OCEAN FIRST LOANS DEFAULT

17. In early 2009, shortly after I left the employ of the Debtors, the Debtors hired a gentleman named Paul Verdi as the General Manager of all of the Debtors. Mr. Verdi held himself out as an expert in financing and project management.

18. It was Mr. Verdi who recommended to the Debtors that they enter into the OceanFirst Loans and consolidate their debt.

19. Unbeknownst to the Debtors, at the time Mr. Verdi was hired, he was under investigation by U.S. Attorney for the Eastern District of Pennsylvania for his actions while employed as an Executive Vice President at Republic Bank in Philadelphia. Eventually, Mr. Verdi was indicted for violations of 18 U.S.C. §656 – Theft, Embezzlement or Misapplication by Bank Officer or Employee. The case was entitled <u>USA v. Verdi</u> and bore case number 2:11-cr-00591-SD-1. Mr. Verdi entered into a plea agreement and served one (1) day in jail and was ordered to pay restitution to the victim.

20. Prior to Mr. Verdi's indictment, Mr. Verdi advised Debtors on a number of questionable financial decisions and transactions. Most notable was with the potential sale by the Debtors of the entire facilities to an entity known as Atlantic Properties. While Atlantic Properties and the Debtors were in negotiations and during the appropriate due diligence period, Mr. Verdi advised the Debtors to stop paying OceanFirst on the First Loan and the Second Loan

and to stop paying real estate taxes. Apparently, Mr. Verdi believed that the closing with Atlantic Properties would be imminent and that the Debtors could use the money it would have otherwise paid to OceanFirst and for real estate taxes, and put that money toward the closing costs.

21. Unfortunately, the closing with Atlantic Properties never came to fruition. However by the time the Debtors realized that it would never close, the Debtors were so far into default with OceanFirst and so far behind on their real estate taxes, that the Debtors had no chance in catching up and curing the defaults.

22. Shortly before the anticipated transaction with Atlantic Properties, the Debtors, along with the rest of New Jersey, were hit with Superstorm Sandy in October of 2012. Superstorm Sandy forced the Debtors to close and the resulting prolonged impact on travel to the region together with the financial hardship experienced by residents in the area, significantly impacted the Debtors' revenues.

23. Mr. Verdi was terminated shortly thereafter, and I was brought in to try and negotiate and restructure the debt with OceanFirst, as well as unsecured debts and obligations for unpaid real estate taxes.

24. OceanFirst began foreclosure proceedings on the First and Second Mortgages, and filed an action for a money judgment in the Law Division of the New Jersey Superior Court; it also sought the appointment of a receiver. Those actions are entitled <u>OceanFirst Bank v. Renault Realty. Co. et als</u>, Docket No. F-006330-14, <u>OceanFirst Bank v. Renault Realty. Co. et als</u>, Docket No. L-534-14, and <u>OceanFirst Bank v. Renault Realty. Co. et als</u>, Docket No. C-22-14.

7

### D. THE FORBEARANCE AGREEMENT

25. In support of my efforts to restructure and renegotiate the debt with OceanFirst, on or about May 29, 2014 OceanFirst and Debtors entered into a Stipulation of Settlement of Foreclosure, Law Division and Receivership Proceedings, Forbearance and Release and Waiver of Claims and Defenses ("Forbearance Agreement"). A true and correct copy of the Forbearance Agreement is attached hereto as **Exhibit B**.

26. Debtors also agreed to the appointment of a fiscal agent. By order dated May 28, 2014, Douglas J. Heun, an accountant with Friedman, LLP, was appointed Special Fiscal Agent, pendente lite over the Businesses, Collateral Real Property all operations of the Debtors and all of their assets.

27. As of the date of this Certification, Mr. Heun remains the Special Fiscal Agent over the Debtors' financial affairs.

28. Unfortunately despite the best efforts of the Debtors, the Debtors were unable to satisfy their obligations under the Forbearance Agreement and Ocean First obtained a foreclosure final judgment against all Debtors in the above entitled actions. The Sheriff Sale in the foreclosure action is currently scheduled for Thursday, November 13, 2014.

29. Pursuant to the Forbearance Agreement, On August 14, 2014 OceanFirst obtained a final judgment in foreclosure against the Debtors. The final judgment in foreclosure provided:

> ORDERED AND ADJUDGED that the Plaintiff is entitled to have the total sum of $7,701,188.06, together with interest at the default contract rate of 18.0% on $6,412,493.48 from July 25, 2014, to the date of final judgment on August 1, 2014 in the sum of $22,359.11, for a total amount of $7,723,547.17, and lawful interest thereafter on the total sum due plaintiff, together with costs of this suit to be taxed, and a counsel fee of $54,407.97 to be included therein, raised and paid in the first place out of the mortgaged premises; and it is further
>
> ORDERED AND ADJUDGED IN THE SECOND PLACE, that the Plaintiff is entitled to have the total sum of $108,006.21, together with interest at the default contract rate of 18.0% on $84,583.04, from July 25, 2014, to the date of

8

final judgment on August 1, 2014 in the sum of $295.92, and lawful interest thereafter on the total sum due plaintiff; for a total amount of $108,302.13 raised and paid in the second place out of the mortgaged premises.

See the Judgment in Foreclosure attached hereto as **Exhibit C**.

### E. OTHER CREDITORS AND PARTIES IN INTEREST

30. In addition to the OceanFirst Bank First and Second Loans, the Debtors have in excess of 200 other unsecured and secured creditors. These creditors include, but are not limited to, the State of New Jersey (which is owed approximately $300,000.00); various vendors who hold unsecured claims in excess of $400,000.00; other secured creditors who hold claims in excess of $130,000.00; and, significantly, Egg Harbor City, Galloway Township, and holders of tax sale certificates, which collectively are owed approximately $900,000.00 in unpaid real estate taxes and interest. Please see the Debtors' respective Chapter 11 Petitions and Schedules for a more detailed statement of creditors and amounts due and owing.

31. Tuscany House LLC is party to two agreements with AdvanceMe Inc., each of which is captioned "Future Receivables Purchase and Sale Agreement." Under the terms of those Agreements AdvanceMe Inc. purchased the interest of Tuscany Hotel LLC in specified amounts of its accounts receivable, and is entitled to receive a specified percentages of future accounts receivable collections. Copies of the subject Agreements are attached hereto as **Exhibit D**. AdvanceMe Inc. and/or its successor in interest will be given notice of the Debtors' motion for authorization to use cash collateral.

### F. FACTS SPECIFIC TO FIRST DAY MOTIONS

   **i. Debtor's Motion for Joint Administration of Cases (the "Joint Administration Motion")**

32. The Debtors seek joint administration of their Chapter 11 Cases for procedural purposes only. Joint administration will obviate the need for duplicative notices, motions,

9

applications and orders, and thereby expedite the orderly administration of these Chapter 11 Cases and reduce administrative costs for the Debtors, their estates, and this Court without prejudicing the substantive rights of any creditors.

33.     Each individual corporate Debtor has many of the same creditors, both unsecured and secured, as the other individual corporate Debtors.  Furthermore, the principals of each individual Debtor are essentially the same.  The principals of each Debtor are comprised of Joe and Geraldine Milza, their children and grandchildren.  A complete breakdown of the principals of each individual Debtor is attached hereto as **Exhibit E**.

34.     The rights of the parties in interest will not be prejudiced by the proposed joint administration of these chapter 11 cases, because each creditor may still file its claim against a particular estate.  In fact, the rights of all creditors will be enhanced by the reduction in costs resulting from joint administration.

35.     Accordingly, the Debtors believe that joint administration of the Debtors' chapter 11 Cases is in the best interests of the Debtors, their estates, and all other parties in interest, and should be granted.

### ii. Debtors' Motion for Authority to Pay Prepetition Wages, Compensation and Employee Benefits (the "Employee Wage Motion")

36.     Pursuant to the Employee Wage Motion, the Debtors seek authority to pay and/or honor certain obligations owing to the Debtors' employees.  The Debtors seek authority to honor all obligations to its employees as such obligations are critical and essential to employee morale and future business needs.

37.     Attached hereto as **Exhibit F**, is a true and correct list of all of the current employees of the Debtors to whom pre-petition wages are currently due and the amounts due to each employee as of November 12, 2014.

38. The Debtors' employees perform a variety of critical functions, including operation of the Debtors' hotel, winery, golf course, banquet facilities and restaurants, marketing, accounting, sales, reservations, resort maintenance, and other related tasks. The employees' valuable skill sets, institutional knowledge and understanding of Debtors' operations and customer relations make the employees essential to the success of these Chapter 11 Cases.

39. Further, just as the Debtors depend on their employees to operate the Debtors' business, the employees depend on the Debtors for their livelihood. The employees will be exposed to significant financial difficulties is the Court does not permit the Debtors to pay all required obligations to the employees in the normal course of business.

40. As is shown by <u>Exhibit F</u> attached hereto, no employee is entitled to any amount in excess of $12,475.

41. Furthermore, during each applicable payroll period, the Debtors routinely deduct certain amounts from employees' paychecks for federal, state, and local income taxes, Social Security and Medicare for remittance to the appropriate federal, state, or local taxing authority ("Payroll Deductions"). Payroll Deductions also include any and all amounts due for all health benefit plans, dental and vision plans, and retirement and 401k contributions. In addition, the Debtors are required by applicable statutory authority to pay from their own funds Social Security and Medicate taxes, and based, on percentage of gross payroll, additional amounts for federal and state unemployment and short term disability insurance.

42. The Debtors believe that because the Payroll Deductions are held for payment to third-parties, and thus, do not constitute property of the Debtors' estates. Out of an abundance of caution, however, the Debtors seek authority to remit the Payroll Deductions and to continue

collecting and remitting Payroll Deductions in the ordinary course of business on a post-petition basis.

      iii. **Debtors' Motion For An Order Authorizing the Debtor to Honor Certain Pre-Petition Customer Obligations, Deposits, Rebates, etc. ("Customer Obligation Motion").**

43. The Debtors request entry of an order authorizing Debtors to honor certain prepaid customer deposits, gift certificates, and gift cards.

44. In the ordinary course of the Debtors' businesses, customers routinely deposit money with the Debtors in connection with a hotel stay, group tour, or banquet room rentals ("Customer Deposits"). Customers providing Customer Deposits then use the Debtors' facilities and services as anticipated, and the Customer Deposits are offset against the total costs. Under certain circumstances, if the customer cancels a reservation, the Customer Deposit is fully refundable. Attached hereto as **Exhibit G** is a detailed spreadsheet showing all Customer Deposits maintained by Debtors' for events scheduled from the Petition Date, up through and including October of 2016.

45. Importantly, the Customer Deposits are not part of the Debtors' estates and the Debtors, therefore, do not have an equitable interest in such deposits. Authorizing the Debtors to honor their prepetition Customer Deposits will not prejudice in any way the Debtors' estates, creditors or other parties in interest. Moreover, the repercussions of not authorizing the Debtors to honor, or refund if necessary, Customer Deposits would be severe and extremely disruptive and damaging to the Debtors' reorganization efforts. For example, a large part of Debtors' business concern hosting weddings and wedding receptions. If the Debtors are unable to meet their obligations to those who have already booked their weddings, some as long as two years ago, then other potential guests will lose faith that the Debtors will be able to honor their deposits

and obligations in the future. This would severely hamper the Debtors ability to survive these reorganization efforts.

46. In addition, in the ordinary course of business the Debtors routinely sell gift certificates and gift cards to their customers. These gift cards and gift certificates may be redeemed for hotel stays, dining, entertainment, and retail merchandize at various locations throughout the Debtors' properties. At this time, the Debtors estimate that, as of the Petition Date, their outstanding gift certificates and gift cards total $196,936.40.

### ii. Debtors' Motion for Authorization to Use Cash Collateral ("Cash Collateral Motion").

47. The real estate that is subject to the Bank's Mortgages (the **"Mortgaged Property"**) was appraised by an appraiser for the Bank, and the Debtors also recently requested an appraisal of the Mortgaged Property. The Bank's appraisal is dated August 7, 2013 and estimates the value the Mortgaged Property to be $8,300.000.00. The Debtors have not yet received the Appraisal they ordered, but they have received a letter from the appraiser advising of his conclusion that the Mortgaged Property has a value of $11,000,000.00. The midpoint of those two valuations is $9,650,000.00.

48. The debtors operating the retail businesses are Renault Winery, Inc., Renault Golf, LLC , and Tuscany House, LLC (the **"Operating Debtors"**) have accounts receivable in the following approximate amounts:

      A. Renault Winery, Inc.: $6,551.00 (including $2500.00 of credit card receivables).

      B. Renault Golf, LLC: $1500.00 (credit card receivables).

      C. Tuscany House, LLC: $11,727.29 (including $2500.00 of credit card receivables).

The credit card receivables are usually paid within 24-48 hours after submission.

13

49. The tangible personal property of the Operating Debtors, in which the Bank has a security interest, has a total approximate value of $379,496.13, as itemized in the schedules filed by the Operating Debtors.

50. The Operating Debtors' budgets are attached to the proposed Interim Order Authorizing Use of Cash Collateral. Based upon my historical knowledge of the Debtors' operations and diligent review of the current circumstances, my reasonable business judgment is that the Debtors' budgets can be achieved, and will allow the Debtors to operate in chapter 11 without the accrual of unpaid liabilities.

### G. CONCLUSION

51. The Debtors' ultimate goal in these chapter 11 cases is to achieve a sale of their business or to obtain sufficient financing to restructure their debt and make the Debtors viable. In the immediate term, however, in order to minimize any loss of value of their business during these chapter 11 cases, the Debtors' most pressing objective is to minimize the disruption to the Debtors' operations to the greatest extent possible. The Debtors' believe that if the Court grants the relief requested in each of the First Day Motions, the prospect for achieving this objective and, in turn, their overriding goal in these chapter 11 cases will be substantially increased.

I declare, under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct to the best of my knowledge, information, and belief.

                                        Renault Winery, Inc. (for itself and on behalf of
                                        each of its affiliated debtors)

November 13, 2014                    /s/ Dennis Del Vecchio
                                        Dennis Del Vecchio
                                        Chief Operating Officer